**IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA**

**CIVIL ACTION**

FILED

OCT 2 9 2003

Date _____ Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,
OFFICE OF THE ATTORNEY GENERAL,

CASE NO.: 03-9797
DIVISION: I

      Plaintiff,

vs.

8:03-cv-2267-T-26TGW RECEIVEd

OCT 24 2003

'EFNDERG TRADE

MEMBERWORKS, INC.,
a foreign corporation,
GEORGE THOMAS, an individual,
and GARY JOHNSON, an individual,

      Defendants.

_____/

## AMENDED COMPLAINT FOR PERMANENT INJUNCTIVE RELIEF AND OTHER STATUTORY RELIEF

Plaintiff, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS, OFFICE OF THE

ATTORNEY GENERAL ("the State") sues Defendants MEMBERWORKS, INC. ("MWI");

GEORGE THOMAS ("THOMAS"), Senior Vice President and General Counsel of MWI; and

GARY JOHNSON ("JOHNSON"), President of MWI, and alleges:

### JURISDICTION AND VENUE

1.      This is an action for damages, injunctive relief, and other statutory relief pursuant to

the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes (2002),

the Florida Anti-Fencing Act, Chapter 812, Florida Statutes (2002); the Florida Communications

Fraud Act, Section 817.034, Florida Statutes; Section 817.41, Florida Statutes (2002); and the



Florida Free Gift Advertising Law, Section 817.415, Florida Statutes (2002).

2.     The State is an enforcing authority of Chapter 501, Part II, Florida Statutes (2002), and is authorized to bring this action and seek penalties and injunctive and other statutory relief pursuant thereto, and may also seek injunctive relief pursuant to Section 817.415(7) (2002), Florida Statutes. Plaintiff is further authorized to bring this action pursuant to Section 812.035, Florida Statutes.

3.     The State has conducted an investigation of the matters alleged herein and Attorney General Charles J. Crist, Jr., has determined that this enforcement action serves the public interest, as required by Section 501.207(2), Florida Statutes (2002). (See attached Exhibit A.)

4.     Defendant MWI is a publicly traded Delaware corporation and is not registered with the Florida Secretary of State to conduct business as either a foreign corporation or fictitious name-entity. MWI maintains offices at 680 Washington Boulevard, Stamford, Connecticut 06901; 9500 West Dodge Road, Omaha, Nebraska 68114; and 7324 Southwest Freeway, Suite 2000, Houston, Texas 77074. This Court has jurisdiction over Defendant MWI under Sections 48.193(1)(a),(b), Florida Statutes (2002), in that MWI, as set forth herein, has engaged in the following acts: (1) operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and (2) committing a tortious act within this state. At all times material hereto, MWI is and has been in the business of direct marketing through mailings, telemarketing, and through the world wide web.

5.     Defendant THOMAS is a natural person and a non-resident of Florida, and Senior Vice President and General Counsel of MWI, 680 Washington Boulevard, Stamford, Connecticut 06901. Defendant THOMAS, presently and at all times material to the allegations of this complaint,

participates in, controls, or possesses the authority to control MWI's acts and practices, and possesses actual or constructive knowledge of all material acts and practices complained of herein. This Court has jurisdiction over Defendant THOMAS under Sections 48.193(1)(b), Florida Statutes (2002), in that THOMAS, as set forth herein, has committed a tortious act within this state.

6.     Defendant JOHNSON is a natural person and non-resident of Florida, and President and Chief Executive Officer ("CEO") of MWI, 680 Washington Boulevard, Stamford, Connecticut 06901. Defendant JOHNSON, presently and at all times material to the allegations of this complaint, directly participates in, controls or possesses the authority to control MWI's acts and practices, and possesses actual or constructive knowledge of all material acts and practices complained of herein. Defendant Johnson has the responsibility and authority to prevent MWI's violations of Florida Statutes concerning deceptive and unfair trade practices, schemes to defraud, and theft. This Court has jurisdiction over Defendant JOHNSON under Sections 48.193(1)(b), Florida Statutes (2002), in that JOHNSON, as set forth herein, has committed a tortious act within this state.

7.     The statutory violations alleged herein occur in or affect more than one judicial circuit in the State of Florida, including Hillsborough County, and the Thirteenth Judicial Circuit.

8.     All actions material to the complaint have occurred between April, 1998, and the present. By written stipulation, actions occurring from April, 1998, through and including October, 1998, are not precluded by the time limitations in Section 501.207(5), Florida Statutes.

## STATEMENT OF FACTS AND
## DEFENDANTS' COURSE OF CONDUCT

### *OVERVIEW OF BUSINESS PRACTICES*

9.     MWI represents itself to be one of the largest third-party marketing services

companies in the United States, with more than $456 million in annual revenue, and "a leading provider of consumer and membership services, [that] designs innovative programs that offer services and discounts on everyday needs in healthcare, personal finance, insurance, travel, entertainment, computing, fashion, and personal security." MWI's products may be referred to herein generally as "memberships" or "membership programs."

10.    MWI has entered into agreements with various businesses such as retailers, catalog merchants, marketing firms, and telemarketing businesses (collectively referred to herein as "Marketers") to sell MWI's membership programs. These agreements provide for MWI to design and approve advertising materials, including telemarketing scripts which are to be read to consumers by telemarketers who are hired by both MWI and outside Marketers. MWI has directed and/or controlled marketing,  including training Marketers, monitoring and recording sales, offering incentives to Marketers, devising guidelines for the conduct of Marketers, and providing marketing scripts.

11.    MWI offers memberships which purport to provide discounts to consumers at establishments, including restaurants, clothing stores, and electronic equipment stores. MWI charges fees for these programs, which range from approximately $49.95 to over $100.00 a year and requires fees to be paid by only credit card. Such membership programs are sold under the names: Essentials[sm], Connections[sm], ValueMax[sm], Travel Arrangements[sm], MoneyMaster[sm], SmartSource[sm], PrivacyPlus[sm], PremierHealth[sm], Premier Health Plus[sm], Premier Health Trends[sm], Home & Garden Rewards[sm], 24Protect[sm], BusinessMax[sm], CardMember Protection Service[sm], HomeWorks[sm], Leisure Advantage[sm] Simply You[sm], Simple Escapes[sm], Galleria[sm], 24 Protect Plus[sm], Privacy Plus[sm], HomeWorks Plus[sm], 24 Assistance[sm], Travel Source[sm], Lifestyle Rewards[sm], Card Protect Plus[sm] and

4

Your Savings Club℠.

12.     Memberships are offered with an initial 30-day trial period which automatically changes into a one-year membership, and automatically renews each year until the consumer cancels, requiring the consumer to act affirmatively to avoid a credit or debit charge.  No written contract is provided to or signed by the consumer before a consumer is charged a membership.

13.     From as early as April, 1998, to the present, MWI has marketed its membership programs to potential customers through advertising, including through the world wide web, direct mail, and telemarketing.  Telemarketing sales include both telemarketer initiated "outbound" and customer initiated "inbound" telemarketing.

14.     "Outbound" telemarketing encompasses calls initiated by MWI-hired telemarketers to consumers for the purpose of offering an MWI membership product.  MWI obtains lists of consumers' names, addresses, and telephone numbers (along with their credit card numbers) from various sources, including the financial institutions that offer credit cards to these consumers.  In return, these issuing financial institutions receive commissions on the MWI sales.

15.     "Inbound" telemarketing encompasses calls by consumers to Marketers in response to advertising, including direct mail (i.e., post card, flyer) or television infomercial.  During this call, the Marketers complete the order for the retail product that the consumer called to purchase.  Through the agreements with MWI, the Marketers then offer MWI memberships to consumers using deceptive sales scripts.  The individual consumer's information (including name, address and credit card number) is then transferred to MWI, without knowledge of the consumer.

### *TELEMARKETING SCRIPTS*

16.     MWI, through agreements with Marketers, is responsible for marketing script design

5

and approval. Marketers are often restricted to use only the marketing materials and scripts provided by MWI. The scripts MWI prepares for outbound calls are substantially different than inbound scripts.

*Outbound Call Scripts*

17.    MWI has created, approved and used misleading outbound telemarketing scripts to deceive consumers. In one example, MWI's script misleads consumers about the telemarketer's affiliation with MWI and the reason for the call. When a consumer answers the call, the telemarketer states that he or she is calling to thank the consumer for being a valued credit card customer. The telemarketer never identifies MWI as the caller, and then endeavors to mislead the consumer into believing that the caller is the credit card company by making frequent references to that company. Such MWI script sample states:

> Hello_____, my name is _____. I just wanted to take a moment of your time to thank you for being a valued **(name of credit card company)** cardholder and to share some exciting news with you. Through an arrangement with **(name of credit card company)**, we're able to offer you a money-saving opportunity called **PremierHealth**.

18.    MWI then misleads consumers by offering "free gifts," such as airline tickets, as an incentive to try their membership programs during these outbound telemarketing calls. MWI, in drafting its scripts, has intentionally misrepresented to consumers their ability to claim the "free gift" airline tickets. The scripts fail to disclose any limitations or requirements for obtaining the tickets. A sample MWI outbound script provides:

> And as a special gift to you Mr(s)_____, you can claim two free round-trip airline tickets for yourself or family to resorts throughout the world, including Florida, the Caribbean, Hawaii, Canada, and London as detailed in the Fly Away Free USA Guide we will send you, just for agreeing to try the program.

6

19.     In fact, consumers who have accepted the MWI offer to try the [membership] program did not receive free airline tickets, only "vouchers." MWI has failed to disclose the financial expense that consumers will face in order to redeem the "vouchers." For example, consumers are required to complete applications, pay non-refundable deposits of approximately $80, register for a specified number of nights at designated hotels or resorts at designated prices and further pay any additional departure and landing taxes. Typically, consumers must spend between $600 and $900 on hotel fees to use the vouchers. MWI has failed to notify consumers of the additional costs until after they agree to try the membership program, or even until after they are charged membership fees.

20.     MWI's scripts tout a risk-free trial period, but fail to disclose the true obligations tied to the membership. MWI has designed its scripts to give consumers the impression that they may join the discount membership program without obligation. These scripts have intentionally failed to disclose clearly the requirement that consumers must cancel to avoid charges. In fact, consumers incur the significant financial obligation of having to pay for membership indefinitely unless they take action to cancel the membership. The MWI scripts have not contained an explanation of the requirement to cancel. Instead, the scripts referred vaguely to the chance that membership "is not for you" and "if your [sic] dissatisfied anytime during the year, just call our 800 number."

21.     MWI also has failed to obtain consumers' consent to have their credit cards charged or to accept an obligation to cancel if the membership is unwanted, as demonstrated in the following excerpts:

(a)     Some MWI outbound scripts manipulate hesitant consumers into trying the program without actually obtaining the consumer's consent. For example, a sample script reads:

7

(If Hesitant)

Mr(s)_____, if after reviewing the membership materials you find that you would save money and benefit from the program, would you go ahead and keep it?

If the consumer responds with "yes," the telemarketer is instructed to confirm that the consumer has consented to the sale.

(b)     A section of a standard MWI script entitled "verification" states:

Now, with your permission, I would like to tape record the confirmation of your *risk-free period*, and your mailing address so there is no chance of any clerical mistakes on my part.  OK? (Emphasis is MWI's.)

The consumer is never asked to consent specifically to anything other than the 30-day risk-free period.

(c)     MWI uses consumers' birth dates ostensibly to prove that permission was given by the consumer to initiate charges to their credit or debit accounts.  The "confirmation" section of an MWI script used to solicit to <u>Sears</u> customers states:

And just to verify that I have your approval to process your <u>risk-free period and that you know how it will be billed</u>, I need the month, day, and year of your birth.  What would that be, please?  (Underlining added.)

22.     Defendants, having participated in the creation of or possessed control over the creation and review of outbound telemarketing scripts, knew or had reason to know, or intentionally avoided knowing, that these scripts were deceptive, or that representations contained therein or omissions by their absence therein were misleading or that the scripts would cause and have caused great consumer confusion and deception; yet they continue using or approving the use of these scripts.

*Inbound Call Scripts*

23.    MWI has purposefully created and/or approved scripts for inbound call telemarketing which were designed to deceive consumers into accepting a "free" trial membership.

24.    MWI memberships are offered as gifts or bonuses to consumers for making the original purchases from the retail Marketer. MWI has intentionally drafted scripts which fail to disclose to consumers that the gifts are actually a purchase. Once consumers agree to receive a membership "kit" (packet of membership documents), consumers are obligated to cancel to avoid billing. This is a separate transaction, and the consumer has an obligation to cancel the trial membership to avoid a credit or debit card charge. Scripts state, for example:

> For purchasing_____, we are sending you a risk free 30 day membership to **ValueMax** shopping service guaranteeing you the lowest prices on name brand TV's, appliances, cameras, computers, and much more, best of all you can receive $30 cash back on all your ... purchases....

25.    These scripts are intentionally devoid of any language that requires a consumer to agree to a credit or debit charge for an MWI membership. In fact, the only thing to which a consumer agrees is to "...look for the kit in the mail."

26.    MWI's scripts fail to provide consumers with either MWI's name or telephone number. However, unless consumers cancel the membership within the 30-day period, their credit or debit cards are charged the MWI program membership fee. Many consumers have complained of receiving the membership kits after 30 days. Since these consumers did not have any of MWI's identifying information required to cancel the trial membership, they were charged an MWI membership fee before they could preview the program as promised.

27.    MWI scripts have been conspicuously void of any verbiage that requires Marketers to obtain consumers' permission to transfer their personal billing information, including name and

9

address and credit card numbers, to MWI.

28.    As a result of these misleading telemarketing scripts, consumers sent written complaints to MWI, many of which were forwarded to the attention of defendant THOMAS.

29.    MWI has not corrected its inbound telemarketing scripts despite thousands of consumer complaints to MWI.

30.    Defendants, having participated in the creation of or possessed control over the inbound scripts, knew or had reason to know, or intentionally avoided knowing, that these scripts were deceptive, or that representations contained therein or omissions by their absence therein would cause and have caused great consumer confusion and deception; yet they continue using or approving the use of these scripts.

## *OTHER DECEPTIVE TELEMARKETING PRACTICES*

### *Unauthorized Charges*

31.    Florida consumers were charged for MWI membership programs despite consumers' explicit refusal of MWI's offers during inbound telemarketing calls.   In the course of its investigation, the State requested audio taped verifications of specific consumer transactions.  MWI responded that no verifications of these specific sales existed and otherwise offered no proof of consumers' consent to the sales transactions, despite contractual requirements and policy requiring monitoring and recording of consumers' consent to the sales.

32.    In numerous documented transactions, MWI charged consumers' credit cards without evidence of consumers' consent to the charges.  On a tape provided to the State by MWI, a consumer was read an inbound call script for MWI's "Essentials" product, and then was asked, "Did you want to receive the [membership] kit in the mail?"  The tape then evidently stops before the consumer

responds and resumes with the telemarketer discussing shipment of the order. The consumer maintains that she did not authorize the transaction.

33.     The State requested MWI to verify consumers' consent relating to approximately 190 consumers who complained that they were charged by MWI without authorization. MWI failed to produce any information confirming that consumers had consented to the transactions in 71% of these requested transactions, contrary to an MWI-stated policy to tape record consumer consent.

34.     Audio tapes fail to reflect complete telemarketer-to-consumer conversations. The State has reason to believe that telemarketers have exercised the ability to selectively record portions of the conversations to manipulate consumers' negative responses to membership into a successful transaction. To meet quotas and expectations and further earn incentive pay, the State has reason to believe that MWI telemarketers deviate from prescribed scripts and make false representations to consumers to complete transactions, regardless of whether consent is obtained.

35.     Even though consent to most of these transactions was not verifiable, MWI has engaged in a practice of processing these transactions as sales, charging consumers' credit cards, and obtaining payment for these transactions.

36.     MWI knowingly processed payments for memberships procured without consumers' consent. Former telemarketers responsible for processing inbound call transaction payments have confirmed that MWI engaged in, and encouraged and supported a common practice of, processing membership sales from inbound call telemarketing without regard to consumers' consent.

37.     Former MWI customer service representatives report that 80% to 90% of all calls received by MWI customer service were calls to dispute unauthorized credit card charges.

38.     MWI contracted with Marketers who did not have the ability to tape record consumer

11

authorizations for verification, and MWI thereby provided an opportunity for unauthorized charges to occur. Examples of Marketers who did not have the ability to record telephone transactions include, but are not limited to, National Telemarketing Services ("NTS"), and Home Shopping Network ("HSN"), both of which conducted outbound telemarketing for MWI. MWI knew, should have known, or intentionally avoided knowing, that neither NTS nor HSN had the capability to tape calls and thus were both unable to provide voice- recorded confirmation of sales. Yet, MWI willingly accepted the sales generated by these companies' telemarketing and processed, without question, the membership charges against consumers' credit cards.

39.    In the course of investigating unauthorized charges, the State learned of an excessively high percentage of complaining consumers who contacted their credit card companies to dispute charges. Once the consumers contacted their credit card companies, the companies notified MWI of each dispute and provided them an opportunity to refute with documentation supporting the validity of the charge. When no supporting documentation was forthcoming, the credit card companies charged back the membership fee from MWI's sales transactions, resulting in a credit to the consumers' accounts. For example, in a six-month period during the State's investigation from December, 2000, through May, 2001, over 55% of all MWI sales transactions submitted to Discover Financial Services were charged back to MWI because consumers successfully disputed the charges. MWI's agreement with Discover to process MWI's credit card charges was also suspended at one point due to an excessive amount of charges being reversed as a result of successful consumer disputes of the charges. Discover's suspension of MWI's credit card processing privileges corroborates the fact that MWI's business practices are improper and unfair, and represents another instance in which Defendants were put on notice of a problem with

12

unauthorized charges.

40.    MWI has also overreached into the private affairs of consumers by charging consumers' phone bills without their consent.  In some instances, if MWI is unsuccessful in processing a credit card charge, MWI unfairly adds charges to consumers' telephone bills without notice to the consumers.  Consumers may then feel coerced to pay a charge that they dispute for fear that their phone service will be interrupted if the bill is unpaid.

41.    Defendant THOMAS designed or supervised and reviewed MWI's telemarketing program.  He was designated the MWI contact for regulatory compliance with respect to HSN and was the contractual representative on many agreements between MWI and Marketers, including NTS and HSN.  With HSN, MWI contractually agreed to share its knowledge and expertise as to outbound telemarketing.  As the contractual representative and designated regulatory contact with respect to HSN, THOMAS knew or should have known of the inability of HSN to record calls and therefore, of the potential for receiving unauthorized transactions.  THOMAS executed the contract between MWI and NTS and, in so doing, knew or should have known of the inability of NTS to record calls, and, therefore, of the potential for receiving unauthorized transactions.

42.    Defendant JOHNSON executed the contract between MWI and HSN, which established an extensive marketing relationship between MWI and HSN.  JOHNSON, together with THOMAS, were designated the MWI contractual representatives to receive notice of issues arising under the contract.

43.    MWI contractually agreed with HSN to share its knowledge and expertise as to outbound telemarketing. MWI, THOMAS, and JOHNSON, as a result of this contractual agreement,

had reason to learn of continuing issues affecting the telemarketing operations, including complaints of unauthorized transactions.

*Cramming*

44.     Certain MWI-hired telemarketers process membership enrollment to consumers and charge consumers' credit cards without even making the required telephone calls to consumers, a practice known as "cramming." Between May and November, 2000, MWI telemarketers charged the credit and/or debit cards of more than 11,000 consumers who appeared on a customer list obtained from HSN and provided to MWI pursuant to their marketing agreement. These 11,000 consumers never received telemarketing solicitations.

45.     In at least one instance, Defendants fraudulently concealed or aided and abetted in the fraudulent concealment of MWI's unfair and deceptive trade practices, including cramming practices. A Florida consumer complained to the Florida Department of Agriculture and Consumer Services ("DCS") that he was never called by an MWI telemarketer, and yet his credit card was charged by MWI. In response to DCS's inquiry into the complaint, MWI falsely represented to DCS the date of sale, a detailed explanation of the content of the call, and a statement that the consumer had specifically agreed to try the program. This response constitutes a willful act to obstruct a governmental investigation and, in fact, is inconsistent with the records MWI produced to the State, which showed that no recording exists to verify this particular sale. Records that the State obtained independently corroborate the fact that no call to, no call content with respect to, and no agreement by this consumer could possibly have occurred. Records maintained by HSN verify that this Florida consumer was one of the 11,000 consumers who were charged for an MWI membership without even receiving a telephone solicitation. MWI's willful attempt to conceal the true facts regarding

14

the Florida consumer's complaint is unlawful.

46.     In another instance, a deceased Florida consumer was charged for two MWI memberships. The consumer died before these "sales" allegedly occurred. The telemarketer who recorded the "sale" to this consumer engaged in a practice of cramming consumer accounts.

47.     Defendants have received many complaints from consumers about unauthorized membership charges, and MWI has had a significant number of sales charged back due to disputed unauthorized charges. Still, MWI continues to charge consumers' credit or debit cards without ensuring that telemarketers obtain consent from consumers. Defendants also continue to transfer consumers' billing information from inbound call retailers without notifying consumers.

48.     As Senior Vice President and General Counsel, Defendant THOMAS knew or should have known, or avoided knowing, that thousands of consumers had complained about unauthorized charges as a result of cramming. In fact, consumer complaints were sent directly to Defendant Thomas's office for review.

*Misrepresentations and Nondisclosure of Membership Provisions*

49.     MWI misrepresents the nature of the membership program and its features and procedures. MWI leads consumers to believe that membership entitles them to apply a discount to the purchase of a product at the time of the purchase. Instead, by way of example, consumers are required to purchase a certificate entitling the consumer to purchase $25 at a particular store, and later receive $5 as a credit on a future credit card statement. MWI further fails to clearly and conspicuously disclose membership provisions limiting the number of times a discount may be used and limiting the maximum dollar value of discounts allowed.

50.     MWI misrepresents the ability of consumers to obtain membership discounts during

15

the 30-day trial period. To qualify for a discount, the consumer's membership must be active at the time the discount is credited to the consumer's account. If a consumer attempts to use the membership to obtain the discount and then cancels within the trial period, the consumer will likely not be active for purposes of receiving the credit. As a result, the consumer never receives the discount and the consumer does not benefit from the free trial period, or is forced to keep the membership in order to receive credit for purchases made during the trial period.

51.   MWI fails to clearly and conspicuously disclose to consumers that membership renewal and billing is automatic each year unless the consumer affirmatively calls to cancel. As a result, consumers in Florida have unknowingly had memberships for several years before discovering that they were being charged by MWI.

52.   MWI fails to disclose in the telephone solicitation and fails to clearly and conspicuously disclose in the membership materials that consumers are required to return their membership cards in order to receive refunds. Failure to disclose this requirement makes it difficult, if not impossible, for a number of consumers to avoid incurring a membership fee.

53.   MWI misrepresents that the 30-day trial period begins when consumers get membership kits. MWI's actual practice is to start the 30-day trial period when enrollment information is provided to MWI by the Marketers, which is often a week or two before the consumer receives the kit. Consumers rarely receive 30 days to try the programs before being charged, and therefore consumers have complained of being charged for kits they never received, receiving membership kits a few days before being charged, and even receiving membership kits after being charged.

54.   MWI conceals the true start of the free-trial period by telling the consumer that they

16

may start using the benefits right away by calling the toll-free number.

55.     After the 30-day trial period, consumers who pay for a one-year membership receive only 11 additional months of benefits. For example, an MWI consumer who accepted a free trial membership on September 4, 1999, was billed for a year of membership in October of 1999, and then charged for an annual renewal on August 7, 2000.

*Deceptive Retention Practices*

56.     MWI continues to employ its misleading and deceptive practices by thwarting consumers' attempts to cancel memberships. MWI professes to allow consumers to cancel their memberships. However, when consumers call to cancel or complain (by dialing the toll-free number listed either on their credit or debit card statement), consumers are connected to MWI "Membership Sales/Service Representatives"( "MSRs"). MWI trains MSRs in "guerilla" or high-pressure sales tactics designed to rebuke consumers' complaints and coerce consumers to retain their memberships or resell the membership using further deceptive techniques. Florida consumers calling to cancel memberships experience lengthy, often argumentative, and high-pressure sales pitches before MSRs will finally address the subject of refunds. MWI, in addition, "recycled" canceling consumers by placing them on a new call list. The list was then used by MWI's in-house Marketers, who called consumers in an attempt to resell them.

57.     MWI trains, expects, and encourages MSRs to retain certain percentages of the complaining consumers as customers. MWI provides MSRs incentive compensation in the form of commissions for retaining consumers memberships for more than a certain period of time.

58.     Many consumers are enrolled in several MWI programs as a result of telemarketing transactions. Due to the different names of the membership programs, consumers are often not

17

aware that the membership provider is MWI. When consumers call to cancel a specific membership, MWI directs or encourages MSRs to cancel only that program, and will not inform consumers about any other programs in which they may be enrolled. MWI pays incentives to MSRs if consumers do not cancel all programs.

59.     When consumers call to complain or seek to cancel their memberships, MSRs have many tactics in which to retain or calm unhappy consumers, including the ability to offer apology "gifts" in the form of restaurant or gasoline coupons. Continuing its deceptive pattern of offering a "gift"disguised as an obligation, MWI considers "acceptance" of the coupons as an act constituting an agreement to both continue the membership and charge the consumers' credit cards. MWI purposefully fails to tell the consumers that "acceptance" constitutes an agreement to continue the membership. MWI charges the consumer's credit card for membership if the consumer accepts delivery of the coupons.

60.     MWI practices dishonesty, or at least reckless disregard for the truth, in addressing consumers' telephone complaints. MWI falsely represents to consumers calling to complain that the transactions about which they are calling were recorded on tape and that the consumers' consent was given, regardless of whether a recording actually exists.

61.     MWI directly or indirectly encourages MSRs to add, or knowingly fails to discourage or prevent MSRs from adding, other memberships to consumers' accounts when the consumers call to cancel.

62.     Consumers face a continuing challenge to monitor their credit card statements to verify receipt of their refund, as MWI engages in a frequent practice of failing to credit refunds immediately. The result is that MWI retains the funds derived from the unauthorized charges for

several future billing cycles.

63.     MWI is directly responsible for hiring, training, motivating, compensating, supervising and ensuring that MSRs engage in fair and lawful transactions on behalf of MWI. MSRs, as hired, trained, and supervised by MWI, have undertaken the foregoing unfair and deceptive retention practices at the direction of and with the actual or constructive knowledge of Defendants.

## *GOVERNMENT INVESTIGATIONS*

64.     Since April, 2000, MWI has entered into agreements with states other than Florida, in which MWI promises to stop its violations of consumer protection laws.  Despite these agreements, the violations continue and Florida consumers continue to be subject to MWI's unfair, fraudulent and deceptive business practices.

65.     Defendant JOHNSON, as President of MWI, with full authority over MWI's business, has willfully failed to implement appropriate changes to MWI's business practices in Florida and has continued to engage in deceptive practices despite consumer complaints and governmental inquiries. MWI receives consumer complaint calls, and it is estimated that at least half of all of the calls received are complaints alleging unauthorized credit card charges processed by MWI. Further, based upon information received, it is believed that one of MWI's stated purposes for making refunds to consumers is to avoid inquiries from various government agencies.  Defendant JOHNSON knew or should have known or  intentionally avoided direct knowledge of the existence of these excessive written and oral complaints, many of which were made by Florida consumers.  A number of other states have investigated MWI's business practices, and Defendant JOHNSON also knew or should have known  or intentionally avoided direct knowledge of these states' concerns.  Defendant JOHNSON authorized and approved compliance agreements with these other states and thereby had

19

direct knowledge of the states' concerns and the actions taken, or not taken, by MWI to purportedly address these concerns.

66.     Defendant THOMAS, Senior Vice President and General Counsel, has consistently held himself out as the representative of MWI during the course of previous governmental investigations. In that capacity, THOMAS attended meetings with governmental officials, received subpoenas, and participated in the preparation of or supervised MWI's response to subpoenas and even signed compliance agreements with other states on behalf of MWI. THOMAS was made fully aware of MWI's practices as described fully above, and intentionally avoided knowing and/or continued to participate in such practices in Florida.

67.     In the instant investigation prior to filing the complaint herein, MWI produced documents in response to the State's subpoena, which clearly reflect complaints forwarded internally at MWI to "legal" and to THOMAS for review. Thus, THOMAS has been made fully aware of the thousands of consumers who have complained about MWI's deceptive practices.

## COUNT I

## VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES DECEPTIVE AND UNFAIR TRADE PRACTICES (DEFENDANT MWI)

68.     The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67 and all exhibits referred to, as if fully set forth herein, and further alleges:

69.     Section 501.202(2), Florida Statutes, establishes the policy of "protect[ing] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce."

20

70.    Section 501.204(1), Florida Statutes, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

71.    At all times material hereto, MWI engaged in "trade or commerce" as defined in Section 501.203(8), Florida Statutes.

72.    By undertaking the activities set forth in Paragraphs 1 through 67, MWI has committed acts or practices in trade or commerce which offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that cause or are likely to cause consumer injury which is substantial, not be outweighed by any countervailing benefits to consumers or competition that the acts or practices produced, and not an injury that consumers themselves could have reasonably avoided.  Thus, MWI has engaged in unfair acts or practices within the meaning of Section 501.204(1), Florida Statutes.

73.    By undertaking the activities set forth in Paragraphs 1 through 67, MWI engaged in representations, acts, practices or omissions which are material and likely to mislead, and in fact did mislead, consumers acting reasonably under the circumstances.  Thus, Defendant MWI has engaged in deceptive acts or practices in violation of Section 501.204(1), Florida Statutes.

74.    By undertaking the activities described in Paragraphs 1 through 67, MWI has engaged in unconscionable acts or practices in trade or commerce, in violation of Section 501.204(1), Florida Statutes.

75.    MWI knew or should have known that the methods, acts and practices set forth in Paragraphs 1 through 67 were unfair, deceptive, unconscionable, or otherwise prohibited by statute.

76.    MWI's acts and practices alleged herein have and continue to injure and prejudice

21

consumers.

77.     Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of MWI will result in irreparable injury to the public, in violation of Section 501, Part II, Florida Statutes.

## COUNT II

### VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES
### DECEPTIVE AND UNFAIR TRADE PRACTICES
### (DEFENDANTS THOMAS AND JOHNSON)

78.     The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67 and all exhibits referred to, as if fully set forth herein, and further alleges:

79.     Defendants JOHNSON and THOMAS, at all times relevant to the complaint herein, directly participated in the conduct alleged herein; or directed or controlled the practices and policies of MWI complained of herein and had authority to control them; and had actual or constructive knowledge of the acts and practices complained of herein; or exercised a reckless indifference to the truth or falsity of such acts or practices; or had an awareness of a high probability of fraud with an intentional avoidance of the truth.

80.     Section 501.204(1), Florida Statutes, provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Section 501.202(2), Florida Statutes, establishes the policy of "protect[ing] the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

81.     By undertaking the activities set forth in Paragraphs 1 through 67, Defendants

JOHNSON and THOMAS have committed acts or practices in trade or commerce which offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or that cause or are likely to cause consumer injury which is substantial, not be outweighed by any countervailing benefits to consumers or competition that the acts or practices produced, and not an injury that consumers themselves could have reasonably avoided. Thus, Defendants JOHNSON and THOMAS have engaged in unfair acts or practices within the meaning of Section 501.204(1), Florida Statutes.

82.     By undertaking the activities set forth in Paragraphs 1 through 67, Defendants JOHNSON and THOMAS have engaged in representations, acts, practices or omissions which are material and likely to mislead, and in fact did mislead, consumers acting reasonably under the circumstances. Thus, Defendants JOHNSON and THOMAS have engaged in deceptive acts or practices within the meaning of Section 501.204(1), Florida Statutes.

83.     By undertaking the activities described in Paragraphs 1 through 67, Defendants JOHNSON and THOMAS have engaged in unconscionable acts or practices in trade or commerce, in violation of Section 501.204(1), Florida Statutes.

84.     Defendants JOHNSON and THOMAS knew or should have known that the methods, acts and practices set forth in Paragraphs 1 through 67 were unfair, deceptive, unconscionable, or otherwise prohibited by statute.

85.     Defendants' acts and practices alleged herein have and continue to injure and prejudice Florida consumers.

86.     Unless Defendants JOHNSON and THOMAS are permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of Defendants will

result in irreparable injury to the public, in violation of Section 501, Part II, Florida Statutes.

## COUNT III

## VIOLATIONS OF FLORIDA ANTI-FENCING ACT
### SECTION 812.014, FLORIDA STATUTES
### CIVIL THEFT
### (DEFENDANT MWI)

87.     The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67 and all exhibits referred to, as if fully set forth herein, and further alleges:

88.     Beginning at an exact date unknown to the State, but at least within five (5) years prior to the filing of the complaint and continuing to the present, MWI, in the course of conducting commercial telephone solicitations marketing discount benefits programs, violated Section 812.014, Florida Statutes.

89.     MWI caused the dissemination of or aided in the dissemination of membership benefit telemarketing solicitations using scripts which contained the false and deceptive statements, omissions, and ruses as set forth in paragraphs 1 through 67, with knowledge at the time of the solicitations, that the representations were false or misleading, or made the representations without knowledge as to the truth or falsity.

90.     MWI participated in or caused the dissemination of the false and deceptive, or misleading telephonic solicitations in order to induce consumers to ultimately give personal identifying information or to otherwise facilitate a charge to the consumers' credit or debit cards.

91.     Based upon the false, deceptive, and misleading solicitations disseminated by MWI or others acting as agents for or in concert with MWI, consumers were charged actual membership fees for the services promoted in MWI's solicitations, without understanding or without giving express consent to MWI to charge consumers' credit or debit accounts.

24

92.     MWI further participated in or aided in false and unauthorized billing to consumers'

credit or debit cards by intentionally failing to properly investigate or police those acting on MWI's

behalf.  Such agents of MWI had the ability to and did charge consumers without their consent, and

MWI, having the capacity to know of such activity, knew, intentionally avoided knowing, concealed

knowing, and/or aided and abetted in the concealment of such activity.

93.     MWI  knowingly obtained and retained consumer credit and/or currency with the

intent to either temporarily or permanently deprive consumers of the rights and benefits thereto, to

appropriate such property for MWI's' own use without the consent of the consumer, as a result of

unauthorized membership charges placed against consumers' credit or debit cards, and intentionally

failed to rectify such activity in order to further retain revenues and profits.

94.     By undertaking such activities set forth in paragraphs 1 through 67 and 87 through

93, MWI has violated Sections 812.014 and 812.035, Florida Statutes.

95.     MWI 's acts and practices alleged herein have and continue to injure and

prejudice consumers.

96.     Unless MWI is permanently enjoined from engaging further in the acts and

practices alleged herein, MWI's continued activities will result in irreparable injury to the public,

in violation of Section 812.014, Florida Statutes.

## COUNT IV

### VIOLATIONS OF FLORIDA COMMUNICATIONS FRAUD ACT
### SECTION 817.034 FLORIDA STATUTES
### DECEPTIVE AND UNFAIR TRADE PRACTICES
### ORGANIZED SCHEME TO DEFRAUD
### (DEFENDANT MWI)

97.     The State adopts, incorporates and realleges herein by reference paragraphs 1 through

67, 87 through 93, and all exhibits referred to, as if fully set forth herein, and further alleges:

98.    Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint and continuing to the present, MWI, in the course of marketing discount benefits programs, violated Section 817.034(4)(a), Florida Statutes.

99.    MWI has engaged in, caused, benefitted from, or otherwise aided and abetted a systematic and ongoing course of conduct with the intent to obtain and did obtain, the property of others by false or fraudulent pretenses, willful misrepresentations, false promises, and willful avoidance.

100.   Statements made in Membership program solicitations were known by MWI to be misleading, untrue, or made with reckless indifference as to their truth or falsity with the intent to defraud.   Such statements were made through communications, as described in Section 817.034(2)(a), Florida Statutes, and in violation of Section 817.034(4)(b), Florida Statutes.

101.   False and misleading statements made in the telephonic solicitations were made with the intent to obtain money from Florida consumers by tricking or intentionally misleading them into believing that they were receiving free airline tickets, receiving thirty (30) days "risk-free" to fully review membership materials, giving out personal identifying information only to process the trial membership, and receiving a trial membership as a "thank you" gift, or bonus-for -purchase without obligation.

102.   MWI's intentional avoidance of knowledge of actual credit and debit card slamming, intentional avoidance of knowledge of consumer deception, intentional use of fraudulent and misleading scripts, the intentional avoidance of abusive practices conducted  by MSRs and Marketers, and the failure to properly audit and police, obtaining consent to tape record as proof of

26

consent to charge by false pretenses, unlawful transfer of consumer billing information, and intentional implementation of requirement for membership card return, overall composed a systematic ongoing course of conduct with the intent to obtain, and did obtain, the property of Florida consumers by false or fraudulent pretenses.

103.     In reliance upon MWI's false and deceptive solicitations, consumers gave personal identifying information, or otherwise responded in the affirmative to "look for the packet in the mail," with the belief that they were agreeing only to trial memberships. These consumers received unauthorized charges on their credit or debit cards. Such credit or currency could have otherwise been used by the consumer for other purchases.

104.     MWI further engaged in, caused, benefitted from, or otherwise aided in a scheme to retain unlawful profits by promoting resell methods by MSRs, which caused MSRs to utilize trickery and deception in order to maintain quotas, and obtain commission, resulting in further deprivation of consumer property.

105.     As part of the scheme to defraud, MWI intentionally concealed and/or misrepresented their relationship with Marketers to government agencies in order to further the use of deceptive and misleading scripts.

106.     In furtherance of the scheme to defraud, MWI knowingly facilitated the practice of cramming by establishing relationships with affiliate marketers without properly policing marketer practices and without enforcement of MWI's own quality assurance standards. MWI knowingly used these Marketers as means of profit while avoiding responsibility for fraudulent sales.

107.     MWI knew or intentionally avoided knowing that methods described in paragraphs 1 through 67, 87 through 93, 97 through 107, would result and did result in consumer deception.

27

108.    By undertaking the acts and practices described 1 through 67, 87 through 93, 97 through 107, MWI has participated in, facilitated, and furthered a scheme to defraud in violation of Section 817.034(4)(a), Florida Statutes. By undertaking the acts and practices described in 1 through 67, 87 through 93, 97 through 107, and thereby violating Section 817.034(4)(a), Florida Statutes.

109.    MWI has engaged in deceptive and unfair acts and practices in trade or commerce, in violation of Section 501.204, Florida Statutes.

110.    Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of MWI will result in irreparable injury to the public, in violation of Section 817.034(4)(a), Florida Statutes.

## COUNT V

## VIOLATIONS OF THE FEDERAL TRADE COMMISSION TELEMARKETING SALES RULE, 16 CFR CH. 1, PART 310
## VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES
## DECEPTIVE AND UNFAIR TRADE PRACTICES
## (DEFENDANT MWI)

111.    The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67, 87 through 93, 97 through 107, and all exhibits referred to, as if fully set forth herein, and further alleges:

112.    Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint, MWI, in the course of marketing discount benefits programs, violated Title16 Section 310 *et seq.*, Code of Federal Regulations (2001), as follows:.

Title16 Section 310.3(a) of the Code states, in pertinent part:

Prohibitive deceptive telemarketing acts or practices.  It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

28

(1) Before a customer pays for goods or services offered, failing to disclose in a clear and conspicuous manner, the following material information:

    (i) The total costs to purchase, receive, use, and the quantity of, any goods or services that are the subject of the sales offer;

    (ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

    \*            \*            \*

(2) Misrepresenting directly or by implication any of the following material information:

    (i) The total costs to purchase, receive, use, and the quantity of, any goods or services that are the subject of the sales offer;

    (ii) Any material restriction, limitation, or condition to purchase, receive, or use the goods or services that are the subject of the sales offer;

    (iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

    (iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

    \*            \*            \*

    (vii) A seller's or telemarketer's affiliation with, or endorsement by, any government or third-party organization;

113.    MWI, in the course of marketing discount memberships to consumers, has further violated Title 16 Section 310.3, Code of Federal Regulations (2001), by marketing discount memberships to consumers without disclosing material limitations to benefits as described above,

by failing to disclose total costs to use goods, by misrepresenting the program's cancellation policy, by misrepresenting the material aspect of the nature of the programs, and by misrepresenting affiliation with third parties.

114.    MWI, in the course of marketing discount packages to consumers, has further violated Title 16 Section 310.4, Code of Federal Regulations (2001), by conducting commercial telephone solicitations to market discount packages to consumers by failing to promptly disclose the identity of the seller. MWI designed scripts to mislead consumers into believing that programs were actually offered by financial institutions and retail companies providing the consumer cardholder lead lists.

115.    Title 16 Section 310.4 states, in pertinent part:

> (d) It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in an outbound telephone call to fail to disclose promptly and in a clear and conspicuous manner to the person receiving the call, the following information:
>
> > (1) The identity of the seller;
> > (2) That the purpose of the call is to sell goods or services;
> > (3) The nature of the goods or services;
>
> > *                              *                              *

116.    By violating Title 16 Section 310, Code of Federal Regulations (2001), MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

117.    MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

118.    Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of MWI will result in irreparable injury to the public, in violation of Section 501.204, Florida Statutes.

30

## COUNT VI

### VIOLATIONS OF THE FLORIDA TELEMARKETING ACT
### SECTIONS 501.605, 501.616, FLORIDA STATUTES
### VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES
### DECEPTIVE AND UNFAIR TRADE PRACTICES
### (DEFENDANT MWI)

119.    The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67, 87 through 93, 97 through 107, and all exhibits referred to, as if fully set forth herein, and further alleges:

120.    The Florida Telemarketing Act, Sections 501.601 through 501.626, Florida Statutes, was enacted to "promote the general welfare of the public and the integrity of the telemarketing industry." Section 501.602, Florida Statutes.

121.    At all times material hereto, MWI has engaged in the business of "commercial telephone solicitation"and as a "commercial telephone seller" as defined in Section 501.603, Florida Statutes.

122.    Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint, MWI, in the course of conducting commercial telephone solicitations marketing membership programs, violated Section 501.605(1), Florida Statutes.

123.    Section 501.605(1), Florida Statutes, provides:

> Prior to doing business in this state, a commercial telephone seller shall obtain a license from the department [Department of Agriculture and Consumer Services]. Doing business in this state includes either telephone solicitation from a location in Florida or solicitation from other states or nations of purchasers located in Florida.

31

124.   MWI, in the course of conducting commercial telephone solicitations, failed to obtain or apply for a commercial telephone seller license from DCS prior to conducting commercial solicitation business in the State of Florida, in violation of Section 501.605(1), Florida Statutes.

125.   MWI, in the course of conducting commercial telephone solicitations without a commercial telephone seller license, engaged in an unlawful act and practice as proscribed by Section 501.616(4), Florida Statutes, which provides:

(4) It shall be unlawful for any commercial telephone seller or salesperson to be unlicensed.

126.   Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint, MWI, in the course of conducting commercial telephone solicitations marketing membership programs, violated Section 501.616(1), Florida Statutes.

127.   Section 501.616(1), Florida Statutes, provides:

It shall be unlawful for any commercial telephone seller or salesperson to require that payment be by credit card authorization or otherwise to announce a preference for that method of payment.

128.   MWI, in the course of marketing membership programs to consumers, required that payment for membership be made by credit card authorization, in violation of Section 501.616(1), Florida Statutes.

129.   By violating Sections 501.605(1), 501.616(1) and 501.616(4), Florida Statutes, MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

130.   MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

131.   Unless MWI is permanently enjoined from engaging further in the acts and practices

32

alleged herein, the continued activities of MWI will result in irreparable injury to the public, in

violation of Sections 501.605(1), 501.616(1), 501.616(4) and 501.204, Florida Statutes.

**COUNT VII**
**VIOLATIONS OF THE FLORIDA TELEMARKETING ACT**
**SECTION 501.615, FLORIDA STATUTES;**
**VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES**
**DECEPTIVE AND UNFAIR TRADE PRACTICES**
**(DEFENDANT MWI)**

132.    The State adopts, incorporates and realleges herein by reference paragraphs 1 through

67, 87 through 93, 97 through 107, and all exhibits referred to, as if fully set forth herein, and further

alleges:

133.    At all times material hereto, MWI has engaged in the business of "commercial

telephone solicitation"and as a "commercial telephone seller" as defined in Section 501.603, Florida

Statutes.

134.    Beginning at an exact date unknown to the State, but at least within four (4) years

prior to the filing of the complaint, MWI, in the course of conducting commercial telephone

solicitations marketing discount membership programs, violated Section 501.615, Florida Statutes.

135.    Section 501.615, Florida Statutes, provides:

    (1)    A purchase of consumer goods or services ordered as a result of a commercial
telephone solicitation as defined in this part, if not followed by a signed
written contract, is not final. If a contract is not made in compliance with this
section, it is not valid and enforceable against the purchaser.  The contract
made pursuant to a commercial telephone solicitation shall:

        (a)    Be reduced to writing and be signed
by the purchaser.

        (b)    Match the description of the goods or
services  as that principally used in the
telephone  solicitation.

33

    (c)    Contain the name, address, telephone number, and registration number of the commercial telephone seller and the salesperson, the total price of the contract, and a detailed description of the goods or services being sold. . . .

*      *      *

    (h)    Contain, in at least 12-point type, immediately preceding the signature, the following statement: "You are not obligated to pay any money unless you sign this contract and return it to the commercial telephone seller."

*      *      *

  (2)    A commercial telephone seller who engages a salesperson to make, or cause to be made, a telephone sales call shall not make or submit any charge to the purchaser's credit card account or make or cause to be made any electronic transfer of funds until after the commercial telephone seller receives from the purchaser a copy of the contract, signed by the purchaser, which complies with this section. The commercial telephone seller shall then send the purchaser a written confirmation of the sale.

136.   MWI, in the course of conducting commercial telephone solicitations to market memberships to consumers, charged membership fees to consumers before finalizing transactions; failed to reduce their transactions to signed, written contracts; failed to inform consumers that transactions not reduced to writing are invalid; failed to include the description of products purchased; and failed to include information about MWI's commercial telephone sellers, in violation of Section 501.615, Florida Statutes.

137.   Additionally, MWI, through its course of conduct, failed to provide consumers an explanation of purchaser's rights and failed to make full and timely refund payments to consumers

34

when one of several factors occurred, including:

    A.      Consumers requested rescission of the contract;

    B.      Membership Kits were not received as promised;

    C.      Consumers transactions were unauthorized; and

    D.      Consumers who had unknowingly been charged were not refunded for

           previous membership years.

138.    Section 501.615(3), Florida Statutes, provides:

    The written contract must contain an explanation of the purchaser's rights
under this section and a statement indicating when notice of cancellation
should be sent...

139.    Section 501.615(5), Florida Statutes, provides:

    If a commercial telephone seller violates the provisions of this part in making
a sale, or fails to deliver an item within 30 calendar days, the contract is
voidable by giving notice to the commercial telephone seller, and the
purchaser is entitled to a return from the seller, within 14 days, of all
consideration paid...

140.    Section 501.615(6), Florida Statutes, provides:

    A person who purchases goods or services pursuant to a solicitation governed
by this part must be given a refund, credit, or replacement, at his or her
option, if:
    (a)    The goods or services are defective, are not as
          represented, or if any item described pursuant
          to this part is not received as promised. . .

141.    MWI, through its course of conduct, violated Section 501.615, Florida

Statutes, by failing to provide a written contract, requesting billing of funds before receiving

any written contract, failing to provide refunds to consumers, and misrepresenting the terms

of the transactions.

142.   Section 501.203(3)(c), Florida Statutes, provides that a violation of Florida's Deceptive and Unfair Trade Practices Act may be based on a violation of any law which proscribes a deceptive act or practice.

143.   By violating Section 501.615, Florida Statutes, MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

144.   MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

145.   Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, the continued activities of MWI will result in irreparable injury to the public, in violation of Section 501.615, Florida Statutes.

## COUNT VIII

### VIOLATIONS OF THE BUYING SERVICES ACT OF 1991
### SECTION 559.3901, et. seq., FLORIDA STATUTES;
### VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES
### DECEPTIVE AND UNFAIR TRADE PRACTICES
### (DEFENDANT MWI)

146.   The State adopts, incorporates and realleges herein by reference paragraphs 1 through 67, 87 through 93, 97 through 107, and all exhibits referred to, as if fully set forth herein, and further alleges:

147.   Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint, MWI, in the course of conducting commercial telephone solicitations marketing discount benefit membership programs,  violated the Buying Services Act

of 1991, Sections 559.3901-3906, Florida Statutes.

148.    Section 559.3902(2), Florida Statutes, provides:

"Buying Service" "Buying Club," or "club" means any corporation, non profit corporation, partnership, unincorporated association, cooperative association, or other business enterprise which is organized with the primary purpose of providing benefits to members from the cooperative purchase of service or merchandise and which desires to effect such purpose through direct solicitation or other business activity in this state.

149.    MWI, in the course of offering discount benefits to members, and operating with a primary purpose of such by the cooperative purchase of service merchandise through telephonic solicitation, has represented itself as a buying service or club.

150.    Section 559.3902(3), Florida Statutes, provides:

"Contract" means any contract or agreement by which a person becomes a member of a buying service or club.

151.    Section 559.3904, Florida Statutes states:

(1)    A copy of a member's contract, with all blank spaces filled in, shall be delivered to the member at the time the contract is signed.

(2)    Every contract shall be in writing, shall be signed by the member, shall designate the date on which the member signed the contract, and shall state...

152.    MWI, in the course of marketing discount membership programs to members, operating as a buying service or club, failed to reduce membership agreements to written contracts, in violation of Sections 559.3902(3) and 559.3904, Florida Statutes.

153.    MWI's violations of the Buying Services Act constitute an unfair and deceptive trade practice pursuant to Section 559.3906, Florida Statutes, which provides:

A violation of this act shall be deemed an unfair and deceptive trade practice

within the meaning of part II of chapter 501. Violators shall be subject to the penalties and remedies provided therein.

154.   Section 501.203(3)(c), Florida Statutes, provides that a violation of Florida's Deceptive and Unfair Trade Practices Act may be based on a violation of any law which proscribes a deceptive act or practice.

155.   By violating Section 559.3904, Florida Statutes, MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

156.   MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

157.   Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, continued activities of MWI will result in irreparable injury to the public, in violation of Section 559.3904, Florida Statutes.

## COUNT IX

### VIOLATIONS OF SECTIONS 817.06 and 817.41, FLORIDA STATUTES PROHIBITING MISLEADING ADVERTISING VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES DECEPTIVE AND UNFAIR TRADE PRACTICES (DEFENDANT MWI)

158.   The State realleges and incorporates herein by reference paragraphs 1 through 67, 87 through 93, 97 through 107 and all exhibits referred to as if fully set forth herein.

159.   Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint and continuing to the present, MWI, in the course of conducting commercial telephone solicitations marketing membership programs, violated Section 817.06 and Section 817.41, Florida Statutes.

38

160.   Section 817.06, Florida Statutes, states:

(1) No person, persons, association, copartnership, or institution shall, with intent to offer or sell or in any way dispose of merchandise, securities, certificates, diplomas, documents, or other credentials purporting to reflect proficiency in any trade, skill, profession, credits for academic achievement, service or anything offered by such person, persons, association, copartnership, corporation, or institution directly or indirectly, to the public, for sale or distribution or issuance, or with intent to increase the consumption or use thereof, or with intent to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, or ownership thereof, knowingly or intentionally make, publish, disseminate, circulate or place before the public, or cause, directly or indirectly, to be made, published, disseminated or circulated or placed before the public in this state in a newspaper or other publication or in the form of a book, notice, handbill, poster, bill, circular, pamphlet or letter or in any other way, an advertisement of any sort regarding such certificate, diploma, document, credential, academic credits, merchandise, security, service or anything so offered to the public, which advertisement contains any assertion, representation or statement which is untrue, deceptive, or misleading.

161.   Section 817.40(5), Florida Statutes, describes misleading advertising as:

any statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

162.   Section 817.41(1), Florida Statutes, provides:

It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

163.   MWI has made or disseminated, or caused to be made or disseminated, before the general public, misleading advertising as defined in Section 817.40(5), Florida Statutes, and in

39

violation of Sections 817.06 and 817.41(1), Florida Statutes.

164.   MWI, in the course of conducting commercial telephone solicitations to market its membership programs to consumers, has advertised through false or misleading statements that: consumers would receive 30 full days to use and review membership program provisions starting from the date the materials are mailed out; consumers could cancel by simply calling; programs were "risk- free"; and benefits could be used without limitations.

165.   MWI, in the course of conducting commercial telephone solicitations to market membership programs to consumers, has further violated Sections 817.06 and 817.41(1), Florida Statutes, by conducting commercial telephone solicitations to market memberships to consumers without disclosing material limitations on benefits as described above, failing to clearly and conspicuously disclose the automatic annual renewal membership fees, failing to clearly and conspicuously disclose the thirty (30) day cancellation procedure and risks, and falsely implying that tape recording of confirmation would be used solely to verify the risk-free period and mailing address information.

166.   MWI has further violated Section 817.41, Florida Statutes, by initiating renewal memberships on the eleventh (11) month of the first membership year, in effect creating a cost to the thirty (30) day risk-free trial period, contrary to the telemarketing solicitations.

167.   Section 501.203(3)(c), Florida Statutes, states that a violation of Florida's Deceptive and Unfair Trade Practices Act may be based on a violation of any law which proscribes a deceptive act or practice.

168.   By violating Sections 817.06 and 817.41, Florida Statutes, MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

169.    MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

170.    Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, continued activities of MWI will result in irreparable injury to the public, in violation of Sections 817.41 and 817.06, Florida Statutes.

**COUNT X**

**VIOLATIONS OF FLORIDA FREE GIFT ADVERTISING LAW
SECTION 817.415, FLORIDA STATUTES
VIOLATIONS OF CHAPTER 501, PART II, FLORIDA STATUTES
DECEPTIVE AND UNFAIR TRADE PRACTICES
(DEFENDANT MWI)**

171.    The State realleges and incorporates herein by reference paragraphs 1 through 67, 87 through 93, 97 through 107 and all exhibits referred to as if fully set forth herein.

172.    Beginning at an exact date unknown to the State, but at least within four (4) years prior to the filing of the complaint and continuing to the present, MWI, in the course of conducting commercial telephone solicitations marketing membership programs, violated Section 817.415, Florida Statutes.

173.    Section 817.415(3)(b), Florida Statutes defines "free" as:

> ...includ[es] the use of terms such as "awarded," "prize," "absolutely without charge," "free of charge;" and words or groups of words of similar intent which reasonably lead a person to believe that he or she may receive, or has been selected to receive, something of value, entirely or in part without a requirement of compensation in any form from the recipient.

174.    Section 817.415(3)(d), Florida Statutes, defines "advertisement" and "advertising" as:

> Includ[es] every form of communication which

41

offers for sale, or attempts to induce the creation
of obligations in exchange for, any item or rights therein.

175. Section 817.415(4), Florida Statutes, provides:

RESTRICTIONS ON THE USE OF THE WORD "FREE." Any item or portion
of an item unconditionally offered as "free" shall in fact be free, without
obligation or requirement of consideration in any form, when accepted in writing
within the time limit set forth in the advertisement or within a reasonable time, if
no time limit is so set. However, any person so receiving and accepting such offer
may be required to pay any necessary transportation or delivery charges directly to
the United States Postal Service or other regulated public carrier.

176. Section 817.415(5), Florida Statues, provides:

REQUIREMENTS FOR ADVERTISEMENTS. Advertising in which items are
offered as free with conditions or obligations necessary to acceptance shall include
a clear and conspicuous statement of any such conditions or obligations and
advertising in compliance herewith shall not be considered deceptive.

177. MWI, through its course of conduct, and while marketing "free" airline tickets,

violated Section 817.415, Florida Statutes, by failing to include a clear and conspicuous statement

of conditions or obligations to receive the airline tickets, including: minimum nights stay

requirements and average hotel prices; landing and departure tax responsibility; payment of a non-

refundable deposit; and using "airline ticket" language without disclosing the procedure to obtain

actual tickets.

178. MWI further violated Section 817.415, Florida Statutes, by initiating renewal

memberships on the eleventh (11) month of the first membership year, in effect creating a cost to the

thirty (30) day risk-free trial period.

179. Section 501.203(3)(c), Florida Statutes, states that a violation of Florida's Deceptive

and Unfair Trade Practices Act may be based on a violation of any law which proscribes a deceptive

act or practice.

42

180.   By violating Section 817.415, Florida Statutes, MWI has engaged in deceptive and unfair trade practices in violation of Section 501.204, Florida Statutes.

181.   MWI knew or should have known that the methods, acts or practices alleged herein were deceptive or unfair.

182.   Unless MWI is permanently enjoined from engaging further in the acts and practices alleged herein, continued activities of MWI will result in irreparable injury to the public, in violation of Section 817.415, Florida Statutes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, State of Florida, Department of Legal Affairs, Office of the Attorney General, respectfully requests that this Court:

A.   Permanently enjoin the Defendants from violating Chapter 501, Part II, Florida Statutes, and engaging in conduct in violation thereof;

B.   Temporarily and permanently enjoin the Defendants from violating Section 501, Part IV, Florida Statutes, and conducting telemarketing practices in violation thereof;

C.   Temporarily and permanently enjoin the Defendants from violating Section 559.3901, Florida Statutes, and marketing buying clubs in violation thereof;

D.   Temporarily and permanently enjoin the Defendants from violating Sections 812.014 and 812.035, Florida Statutes, and conducting billing in violation thereof;

E.   Temporarily and permanently enjoin the Defendants from violating Sections 817.06, 817.41 and 817.415, Florida Statutes, and conducting any marketing in violation thereof;

F.   Temporarily and permanently enjoin the Defendants from violating Section 817.034,

Florida Statutes, and conducting any marketing, billing or other scheme to defraud consumers in Florida in violation thereof;

G.   Temporarily and permanently enjoin the Defendants from engaging, in any medium, in the following solicitation or promotional practices in Florida:

   1)   Using terms, including, but not limited to, "risk-free," or the like, that create the false illusion of no obligation arising from acceptance of the telemarketing solicitation;

   2)   Billing without prior proof of express consumer authorization;

   3)   Billing without written agreements signed by consumer;

   4)   Requiring payment by credit card authorization;

   5)   Acting in the capacity as a "commercial telephone seller" without proper licensure;

   6)   Misrepresenting the trial period start date;

   7)   Any violations of Title 16 Section 310, Code of Federal Regulations;

H.   Require that consumers be told about all memberships enrolled in when claiming membership was unauthorized;

I.   Require that all limitations and requirements of membership programs be disclosed clearly and conspicuously in both inbound and outbound call scripts;

J.   Require that all limitations and requirements of membership programs be reduced to written form and disclosed clearly and conspicuously;

K.   Require MWI to obtain the permission of consumers before transferring or accepting transfers of consumer billing information in both outbound and inbound call campaigns;

44

L.   Require that MWI refrain from finalizing a sale of a membership to a consumer, until they have provided the consumer with, and confirmed receipt thereof, a complete description of membership programs; and upon the free trial period expiration, not to bill unless the consumer affirmatively and expressly agrees to purchase the membership or MWI expressly confirms that membership kit was received by consumer;

M.   Assess civil penalties against Defendant MWI, in the amount of $10,000 for each violation of Chapter 501, Part II, Florida Statutes, pursuant to Section 501.2075, Florida Statutes, and $15,000 for each violation thereof involving a handicapped person or senior citizen pursuant to Section 501.2077, Florida Statutes;

N.   Assess civil penalties against Defendant MWI, in the amount of $10,000 for each violation of Chapter 501 Part IV, pursuant to Section 501.619, Florida Statutes;

O.   Assess civil penalties against Defendant THOMAS, individually, in the amount of $10,000 for each violation of Chapter 501, Part II, Florida Statutes, pursuant to Section 501.2075, Florida Statutes, and $15,000 for each violation thereof involving a handicapped person or senior citizen pursuant to Section 501.2077, Florida Statutes;

P.   Assess civil penalties against Defendant JOHNSON, individually, in the amount of $10,000 for each violation of Chapter 501, Part II, Florida Statutes, pursuant to Section 501.2075, Florida Statutes, and $15,000 for each violation thereof involving a handicapped person or senior citizen pursuant to Section 501.2077, Florida Statutes;

Q.   Award the State attorneys fees and costs pursuant to the provisions of Chapter 501,

45

Part II, Florida Statutes, and as otherwise may be allowable by applicable statutes;

R.    Require disgorgement of profits and award restitution and refunds to Florida consumers for each violation of Florida law; and

S.    Award such other relief as the interests of justice shall require and that this Honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

The State demands a trial by jury for all issues so triable.

Respectfully submitted,

CHARLES J. CRIST, JR.
ATTORNEY GENERAL

TERRI E. OSTER
ASSISTANT ATTORNEY GENERAL
Department of Legal Affairs
Concourse Center 4
3507 East Frontage Road, Suite 325
Tampa, Florida 33607
(813) 287-7950
(813) 281-5515 (facsimile)
Florida Bar No. 059749

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL ACTION

STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,
OFFICE OF THE ATTORNEY GENERAL,

       CASE NO._____
       DIVISION _____

     Plaintiff,

v.

MEMBERWORKS, INC.,
a foreign corporation,
GEORGE THOMAS, an individual,
and GARY JOHNSON, an individual,

     Defendants.
_____/

## DETERMINATION OF PUBLIC INTEREST

COMES NOW, CHARLES J. CRIST, JR., ATTORNEY GENERAL, STATE OF FLORIDA, and states:

1.     Pursuant to Section 20.11, Florida Statutes, I am the head of the Department of Legal Affairs, State of Florida (hereinafter referred to as the Department).

2.     In this matter, the Department seeks an injunction and other equitable relief on behalf of one or more consumers caused by an act or practice performed in violation of Chapter 501, Part II, Florida Statutes.

3.     I have reviewed this matter and I have determined that an enforcement action serves the public interest.

Dated: **7·17·03** _____

_____
CHARLES J. CRIST, JR.
ATTORNEY GENERAL
STATE OF FLORIDA


EXHIBIT
A